> This Opinion is a
> Precedent of the TTAB

Mailed: September 15, 2020

# UNITED STATES PATENT AND TRADEMARK OFFICE

————

## Trademark Trial and Appeal Board

————

## *In re AC Webconnecting Holding B.V.*

————

Serial Nos. 85635277 and 85635287

————

Michael C. Cerrati of Jolley Law Group LLC for AC Webconnecting Holding B.V.

Kim Teresa Moninghoff, Trademark Examining Attorney, Law Office 113 (Myriah Habeeb, Managing Attorney).[1]

————

Before Kuhlke, Cataldo and Lynch,
Administrative Trademark Judges.

Opinion by Cataldo, Administrative Trademark Judge:

Applicant, AC Webconnecting Holding B.V., filed two applications amended to seek registration on the Supplemental Register, based on Section 44(e) of the Trademark Act, 15 U.S.C. § 1126(e), for .CAM (in standard characters), and [2] (".CAM

---

[1] The involved applications were reassigned to the above-listed Examining Attorney after briefing.

[2] Application Serial Nos. 85635277 and 85635287 were filed on May 25, 2012 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), asserting a claim of priority under Section 44(d) of the Trademark Act, 15 U.S.C. § 1126(d). In both applications, Applicant replaced Section 1(b) as a filing basis with Section 44(e) of the Trademark Act, 15 U.S.C. § 1126(e), based upon European (EU) Office for Harmonization in the Internal Market (OHIM) Registration Nos. 010483501 and 010483618, respectively issued on December 6, 2012 and July 12, 2012.

designations") as marks, both reciting identical, extensive lists of services in International Classes 35, 38, 42 and 45, as discussed infra in our consideration of the substantive refusal of registration.

The Trademark Examining Attorney refused to register Applicant's proposed marks for certain services in both applications under Section 23 of the Trademark Act of 1946, 15 U.S.C. §1091, on the ground that the .CAM designations do not function as source indicators and are incapable of distinguishing Applicant's services from those of others or indicating the source of Applicant's services. When the refusals were made final, Applicant appealed. The appeals are fully briefed.

## I.    Proceedings Consolidated

These appeals concern co-pending applications and common issues of law and fact, so we hereby consolidate them for final decision. Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 1214 (June 2020). *See also, e.g., In re S. Malhotra & Co.*, 128 USPQ2d 1100, 1102 (TTAB 2018) (Board sua sponte consolidated two appeals); *In re Anderson*, 101 USPQ2d 1912, 1915 (TTAB 2012); *In re Country Music Ass'n, Inc.*, 100 USPQ2d 1824, 1827 (TTAB 2011).

## II.    Relevant Procedural History

After briefing of the appeals, the Board sua sponte remanded the involved applications to the Examining Attorney to consider evidence submitted by Applicant

---

Application Serial No. 85635287 includes the following description and color statements: "The mark consists of a green period or decimal point preceding the word 'CAM' in the color black." "The color(s) green and black is/are claimed as a feature of the mark."

with its reply brief.[3] The Examining Attorney treated the evidence submitted by Applicant as a request for reconsideration and issued a denial thereof.[4] After the Board resumed the appeals[5], the Examining Attorney requested remand of the involved applications for consideration of new evidence raising a potential issue involving Applicant's ownership of the proposed marks.[6] The Board granted the Examining Attorney's request for remand.[7] The Examining Attorney issued a Final Office Action, withdrawing the refusal of registration as to the following services:

> Accounting consultation; Business advice and information relating to loans, finance and capital; Business assistance, advisory and consulting services in the field of filing business formation documents; Economic feasibility studies; Payroll administration and management services; Payroll preparation; development of processes for the analysis and the implementation of strategy plans and management projects, in Class 35;

> Rental of telecommunication equipment, namely, facsimile machines, in Class 38; and

---

[3] 12 TTABVUE. As explained in the remand order, Applicant's evidence in this case was responsive to a request for information raised by the Examining Attorney in the First Office Action, and was being submitted with the Examining Attorney's asserted consent. *Id*. at 2-3. Thus, based on the circumstances presented, the Board remanded the involved applications for consideration of Applicant's evidence submitted with its reply brief. *Id*. at 2-3.

Citations to TTABVUE throughout the decision are to the Board's public online database that contains the appeal proceeding file, available on the USPTO website, www.USPTO.gov. Before the TTABVUE designation is the docket entry number; and after this designation are the page references, if applicable.

All citations to documents contained in the TSDR database are to the downloadable .pdf versions of the documents in the USPTO TSDR Case Viewer. *See, e.g.*, *In re Peace Love World Live, LLC*, 127 USPQ2d 1400, 1402 n.4 (TTAB 2018).

Citations to TTABVUE and the application examination record reference Application Serial No. 85635277 unless otherwise noted.

[4] 13 TTABVUE.

[5] 14 TTABVUE.

[6] 15-25 TTABVUE.

[7] 26 TTABVUE.

> Consulting services in the field of office and workplace automation, in Class 42;[8]

and maintaining the refusal of registration as to the remaining services, as discussed infra.[9] The Board then issued an order resuming proceedings and allowing time for Applicant to submit a supplemental brief, and for the Examining Attorney to submit a supplemental brief in response.[10] Thereafter, the Board issued an order noting that Applicant did not submit a supplemental brief, and indicating that a decision would issue in due course.[11] Afterward, the Board issued an order denying the Examining Attorney's second request for remand to file a supplemental brief.[12]

## III.    Introduction of New gTLDs

In 2011, the Internet Corporation for Assigned Names and Numbers (ICANN), the organization that helps govern the use of Top Level Domains ("TLDs"), authorized the launch of a program to introduce numerous, new generic TLDs or gTLDs.[13] As the USPTO acknowledges, some of these gTLDs "may have significance as source identifiers." TMEP § 1215.02.

---

[8] 27 TTABVUE.

[9] 27 TTABVUE 2-4.

[10] 28 TTABVUE.

[11] 29 TTABVUE.

[12] 31 TTABVUE; 30 TTABVUE.

[13] *See, e.g.*, June 4, 2012 Office action at .pdf 95-7, excerpted above. A gTLD is a TLD or top level domain that does not represent countries or territories. At the time of trial, there existed "just over 20 generic top-level domains (the most notable being .com, .net, .org, .edu, .biz) plus top-level domains for most countries." *Id* at .pdf 95; *see also* Trademark Manual of Examining Procedure (TMEP) §§ 1215.01 and 1215.02 (October 2018).

In its reply brief, Applicant informs that it "has recently been awarded the .CAM TLD and is in the process of finalizing its contract with ICANN."[14] Evidence of record further demonstrates that subsequent to the filing dates of the involved applications and briefing of these appeals, Applicant entered into a registry agreement with ICANN, designating Applicant as the Registry Operator for the .CAM gTLD.[15]

The involved applications do not explicitly and directly recite registry operator or registrar services.[16] Nonetheless, Applicant acknowledges that it is the registry operator for the .CAM gTLD and its recitation of Class 45 services includes domain name registration, conducting domain name searches, legal services and consulting, all related to the .CAM gTLD. We find as a result that the services identified in the involved applications encompass registry operator services for purposes of our determination of whether the applied-for .CAM designations are capable of functioning as indicators of source under Section 23 of the Trademark Act.

---

[14] 9 TTABVUE 4.

[15] Applicant's October 16, 2017 Response to Office Action at .pdf 9-100.

[16] As explained in TMEP § 1215.02(d): "A 'registry operator' maintains the master database of all domain names registered in each top-level domain, and also generates the 'zone file,' which allows computers to route Internet traffic to and from top-level domains anywhere in the world, and a 'registrar' is an entity through which domain names may be registered, and which is responsible for keeping website contact information records and submitting the technical information to a central directory (i.e., the 'registry'). The terms 'registry operator' and 'registrar' refer to distinct services and are not interchangeable. Further, 'registry operators' and 'registrars' are distinguishable from re-sellers, which are entities that are authorized by registrars to sell or register particular Internet addresses on a given top-level domain."

## IV.    Refusal of Registration under Section 23

The Examining Attorney has refused registration under Section 23 of the Trademark Act, 15 U.S.C. § 1091, on the ground that Applicant's proposed marks are incapable of identifying and distinguishing Applicant's services, and therefore are not eligible for registration on the Supplemental Register.

### A.  Legal Standard under Section 23

Section 23 of the Trademark Act, 15 U.S.C. §1091, provides, in relevant part, as follows:

> (a) … Nothing in this section shall prevent the registration on the supplemental register of a mark, capable of distinguishing the applicant's goods or services and not registrable on the principal register under this chapter … .

> (c) For the purposes of registration on the supplemental register, a mark may consist of any trademark, symbol, label, package, configuration of goods, name, word, slogan, phrase, surname, geographical name, numeral, device, any matter that as a whole is not functional, or any combination of any of the foregoing, but such mark must be capable of distinguishing the applicant's goods or services.

Matter that does not operate to indicate the source or origin of the identified goods or services and distinguish them from those of others does not meet the statutory definition of a trademark and may not be registered, regardless of the register on which registration is sought. *See In re Helena Rubinstein, Inc.*, 410 F.2d 438, 441-42, 161 USPQ 606, 608-09 (CCPA 1969) (finding PASTEURIZED for face cream so highly descriptive that it fails to function as a source identifier, noting that a proposed mark "cannot properly be registered as a trademark, even on the Supplemental Register, unless it is intended primarily to indicate origin of the goods and is of such a nature

that the ordinary purchaser would be likely to consider that it indicated such origin"); *D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710 (TTAB 2016) (granting petition to cancel a registration for I ♥ DC on the Supplemental Register because the proposed mark failed to function as a trademark).

For any proposed mark, incuding a gTLD, the determination whether the designation is capable of functioning as a mark focuses on consumer perception. *See, e.g., United States Patent and Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2305-07 (2020) (dealing with a genericness refusal); *D.C. One Wholesaler*, 120 USPQ2d at 1713 ("The critical inquiry in determining whether a designation functions as a mark is how the designation would be perceived by the relevant public.") (citation omitted).

There have been many decisions assessing the trademark significance of gTLDs, usually in a context where there is another word or words to the left of the "dot." In these cases, the Board and its primary reviewing court have consistently noted that gTLDs rarely add any source identifying significance to a mark. *See In re Hotels.com, L.P.*, 573 F.3d 1300, 91 USPQ2d 1532, 1537 (Fed. Cir. 2009) (noting the "standard usage of '.com' to show a commercial internet domain" in affirming the Board's finding that HOTELS.COM is generic for "providing information for others about temporary lodging; travel agency services, namely, making reservations and bookings for temporary lodging for others by means of telephone and the global computer network"); *In re 1800Mattress.com IP LLC*, 92 USPQ2d at 1684 (Fed. Cir. 2009) (".com" in MATTRESS.COM signified the standard meaning of a commercial internet

domain); *In re CyberFinancial.Net, Inc.*, 65 USPQ2d 1789, 1792 (TTAB 2002) ("Applicant seeks to register the generic term 'bonds,' which has no source-identifying significance in connection with applicant's services, in combination with the top level domain indicator '.com,' which also has no source-identifying significance. And combining the two terms does not create a term capable of identifying and distinguishing applicant's services."); *see also Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 66 USPQ2d 1321, 1327-28 (6th Cir. 2003) (finding that the post-domain path of a URL does not typically signify source).

However, both the Supreme Court and the Federal Circuit have explained that this is not a per se rule. In *In re Oppedahl & Larson*, 71 USPQ2d at 1373, the Federal Circuit stated:

> The commercial impression created by ".com" is similar to the impression created by "Corp." and "Co.", that is, the association of a commercial entity with the mark. TLDs, however, can convey more than simply the organizational structure of the entity that uses the mark. For example, TLDs immediately suggest a relationship to the Internet. Thus, the per se rule in *Goodyear* that "Corp.", etc. never possess source-indicating significance does not operate as a per se rule, but more as a general rule, with respect to TLDs.

(*citing Goodyear's Rubber Mfg. Co. v. Goodyear Rubber Co.*, 128 U.S. 598, 602 (1888); *accord Booking.com B.V.*, 140 S. Ct. at 2306-07 (rejecting a per se rule that "Generic.com" marks are automatically generic or nongeneric).

With respect to gTLDs by themselves proposed as marks, this tribunal has found that proposed marks consisting solely of a gTLD engender the commercial impression merely of a top-level domain associated with the term comprising the proposed mark. *See In re theDot Commc'ns Network LLC*, 101 USPQ2d 1062, 1067 (TTAB 2011)

(.MUSIC found to be merely descriptive top level domain name similar to .com or .net in connection with multimedia goods and services in the field of entertainment.). Unless there is evidence in the record indicating to the contrary, we observe that gTLDs almost invariably would be perceived by consumers as serving purposes other than source-identification. This is because gTLDs function as a portion of an Internet domain name and consumers are highly conditioned to view a gTLD as signifying that function. As a result, consumers would not perceive such gTLDs as trademarks. We further observe that gTLDs are intended to be used by multiple, often numerous, parties as part of their own domain names, including domain names consisting in part of their own trademarks (e.g., NIKE.COM) to identify their individual websites.

Consistent with precedent rejecting a per se rule, USPTO policy presently recognizes that a designation consisting of a gTLD may be shown to function as a mark for services encompassing domain-name registry operator and registrar services based on evidence, including that the designation was previously registered with or without the "dot" as a trademark in the United States for goods/services that are related to the subject matter of the websites to be registered via the domain name registry operator and registrar services. *See* TMEP § 1215.02(d)(i)-(iv). We do not opine in this decision upon the applicability of the policy set forth in TMEP § 1215 to the .CAM designations under consideration herein, but we do observe that Applicant has submitted no evidence that it owns prior US trademark registrations for .CAM or CAM marks. We note in addition that Applicant's Registry Agreement with ICANN

does not contain Specification 13, applicable to "Brand gTLDs."[17] Rather, Applicant's Registry Agreement with ICANN contains Specification 11, applicable to "Generic String" gTLDs.[18]

### B. Evidence

In support of their positions, Applicant and the Examining Attorney introduced evidence, of which the following dictionary definitions and screenshots from third party webpages and from Applicant's webpages are most probative of the issue before us.[19]

> Definitions from Google.com: "cam" – *inter alia* "short for camera" (January 9, 2015 Office action at .pdf 8); "camera" – "a device for recording visual images in the form of photographs, film, or video signals" (*Id.* at .pdf 11).

Of the screenshots from Applicant's website submitted by Applicant and the Examining Attorney, the following examples are probative:

---

[17] Applicant's October 16, 2017 Response to Office Action at .pdf 7; March 30, 2017 Motion to Remand at .pdf 44.

[18] Applicant's October 16, 2017 Response to Office Action at .pdf 96-7. Although the Office is not bound by ICANN's criteria for awarding new gTLDs, ICANN's Registry Agreements distinguish between gTLD strings composed of existing trademarks (Brand) and those that are "generic string." *See* December 21, 2017 Office Action at .pdf 3, citing ICANN, New Generic Top-Level Domains, available at https://newgtlds.icann.org/en/applicants/agb/base-agreement-contracting/specification-13-applications. Specification 11 is entitled "Public Interest Commitments" and defines "generic string" as follows: "'Generic String' means a string consisting of a word or term that denominates or describes a general class of goods, services, groups, organizations or things, as opposed to distinguishing a specific brand of goods, services, groups, organizations or things from those of others." *Id.* at .pdf 97.

[19] Screenshots from the third party webpages are contained in an appendix to this decision. Screenshots from Applicant's webpages are shown infra in the body of the decision.



(Applicant's June 12, 2014 Response to Office Action at .pdf 5); and



(Applicant's June 12, 2014 Response to Office Action at .pdf 6).

The following information, submitted by the Examining Attorney, is taken from a Google translation of a page from Applicant's website and appears with its proposed  mark:[20]

> The TLD is designed to make [it] easier for Internet users by offering the use of appropriate namespaces for individuals, organizations and companies [with] sites or services that are affiliated with camera, photography or film. The Company is a web services company … and has been operational since 1994 (first company of the group).
>
> The TLD will be offering web space … to create, distribute and exchange … entertainment, information and services in which cameras, photography and film are involved. The TLD will [promote] a broad range of personal, commercial and social interests through, among other [things] webcams, websites, social networks, e-mail and other technologies that will be located within the domain .CAM.
>
> Nowadays cameras for various purposes [are] used in combination with the Internet [for] distribution and or other services. A few examples are the use of webcams for security, video-conferencing and entertainment. A good example can be seen on Youtube, one of the most popular websites. [C]ameras in combination with Internet technology can be used to create a wide range of information and entertainment for all sorts of people all over the world. The .CAM TLD will … give everyone the opportunity to have their own domain, where they can offer their own information, entertainment, and other services that combine the wonders of photography [with] the Internet.
> (July 30, 2015 Office Action at .pdf 6).

The following information, submitted by the Examining Attorney, also is taken from Applicant's website (color emphasis supplied by Applicant):

> For over 20 years, AC Webconnecting provides connected software tools which assure to our customers a quality professional service. Day after day, we safely answer millions of queries around the world. Our

---

[20] Our insertion of bracketed material reveals our view of the intended content after translation, and unnecessary or redundant phrases have been omitted.

infrastructure, spread out over 5 countries, meet[s] over one million visitors each day. In 2015, we recorded 125 million unique visitors and nearly 2 billion page views, with a positive response rate of 99.99%.

Today, AC Webconnecting meets a serious new challenge: manage the new domain name extension .CAM. The designation of AC Webconnecting as Registry of this new generic extension (gTLD) is the result of five years of hard work, during which we had to convince the different parties. The award of .CAM shows the trust that ICANN gives to AC Webconnecting.

According to the launch schedule, the new extension .CAM is in test until September 2016. You can register domain names with the extension .CAM starting from October.
(December 21, 2017 Office Action at .pdf 7).

Applicant introduced into the record the affidavit of Antje Shoneveld Caumont, its

Director General, with accompanying exhibits, averring the following:[21]

The above-referenced mark has become distinctive of the services offered in connection therewith by virtue of the following:

1. Applicant has substantially exclusively and continuously used its mark in U.S. interstate commerce for nearly 10 years, since 2006. Such use has primarily occurred on the Internet, by Applicant featuring the mark on various websites Applicant owns and/or controls.

2. Applicant owns over 400 domain names that incorporate and prominently feature the term CAM. Attached hereto as Exhibit A is a true and correct copy of such domain names currently owned by Applicant.

3. Applicant's Mark is prominently featured on Applicant's primary website, www.xlovecam.com. This website receives more than 50,000,000 visitors per month, which consistently

---

[21] 4 TTABVUE 21-60. Applicant submitted this declaration in support of its claim of acquired distinctiveness, which is no longer an issue inasmuch as the applications have been amended to seek registration on the Supplemental Register. Nonetheless, the declaration has some probative value regarding whether consumers would perceive the designations at issue as capable of functioning as service marks under Section 23 of the Trademark Act, 15 U.S.C. § 1091.

make[s] it one of the top 3,500 websites viewed worldwide. Attached hereto as Exhibit B is a true and correct copy of Applicant's Mark featured on www.xlovecam.com and a copy of the worldwide website ranking from www.alexa.com.

4. Applicant's Mark is also prominently featured on Applicant's website www.cam.be, which registered on March 13, 2000. Attached hereto as Exhibit C is a true and correct copy of Applicant's Mark featured on www.cam.be.

5. In addition to the foregoing widespread use of Applicant's Mark, Applicant has obtained the following trademark registrations for its mark throughout the world.

   These registrations are evidence that Applicant's Mark has been found to be distinctive when used in connection with Applicant's services.

   a. Community Trademark Registration for .CAM (and Design), Registration no. 010483618, a true and correct copy of which is attached hereto as Exhibit D.

   b. Community Trademark Registration for .CAM, Registration no. 01048350, a true and correct copy of which is attached hereto as Exhibit E.

   c. Andorra Certificate of Registration for CAM, Registration no. 32780, a true and correct copy of which is attached hereto as Exhibit F.

6. Applicant has spent substantial sums in the advertising and promotion of its mark. For example, Applicant spent over $20,000,000.00 on the promotion of its mark solely with Google. Applicant also has an annual advertising and marketing budget of approximately $3,500,000.00, which focuses primarily on Internet advertising.

7. In addition, Applicant and Applicant's Mark receive extensive exposure through the use of Applicant's affiliate program, which allows other websites to utilize Applicant's broadcasting and related services. To date, Applicant's affiliate program has generated over $49,000,000.00 for Applicant and resulted in payouts to Applicant's affiliates of over $10,900,000.00.

8. Applicant's Mark is also featured at various events taking place worldwide that Applicant frequently sponsors. Such events include Camming Con 2015 in Miami, FL; The Island Gathering in the Bahamas; The European Summit in Prague, Czech Republic; Webmasteraccess in Amsterdam, The Netherlands; and the AW Summit in Mamaia, Romania.

9. Applicant has also entered [into] agreements with various trademark and domain name clearinghouses, such as EuroDNS, S.A., to help police the unauthorized use and registration of domain names featuring Applicant's Mark.

10. Applicant has also applied to be the registry operator and manager of the .CAM top-level domain name with the Internet Corporation for Assigned Names and Numbers ("ICANN"). Currently, the application is awaiting a determination by ICANN.

(Applicant's June 22, 2015 Request for Reconsideration at TSDR 19-21; 4 TTABVUE 21-23. As discussed infra, Applicant subsequently has become the registry operator and manager of the .CAM top-level domain.).

Finally, Applicant submitted copies of third-party registrations issued on the Principal Register without a claim of acquired distinctiveness under Section 2(f), for cameras and related goods (typed or standard characters unless otherwise noted):

> RESI-CAM (Reg. No. 3143812); AERO-CAM (Reg. No. 3450623); TUFF-CAM (Reg. No. 4407413); CAM-REMOTE and design (Reg. No. 1274191); BUS-CAM (Reg. No. 1801957); RAIL-CAM (Reg. No. 1849115); CAMTRAK in stylized form (Reg. No. 1578758); CAM-WRAP and design (Reg. No. 1321998); E.CAM (Reg. No. 2124352); PEN CAM (Reg. No. 2687145); Q-CAM and design (Reg. No. 3430059); ZCAM (Reg. No. 3713800); NCAM (Reg. No. 4442442); GCAM (Reg. No. 4255012); QCAM (Reg. No. 3773583); Y-CAM and design (Reg. No. 3910348); C-CAM (Reg. No. 4234576); +CAM (Reg. No. 4258844).

(Applicant's December 26, 2014 Response to Office Action at TSDR 11-47).

### C. Discussion

The applications involved herein do not rely upon use of the proposed marks in commerce, but rather are based upon Applicant's ownership of European Union registrations pursuant to Section 44(e) of the Trademark Act, 15 U.S.C. § 1126(e). Nonetheless, the evidence of record excerpted above establishes ways the applied-for designations are used by Applicant and would, if used in the U.S., be perceived by consumers. *Cf. In re Right-On Co.*, 87 USPQ2d 1152, 1157 (TTAB 2008) (noting that, with respect to §66(a) applications, "it is appropriate for examining attorneys to issue an ornamentation refusal if the mark is decorative or ornamental on its face as depicted on the drawing page and described in the description of the mark."); TMEP § 1202.17(c)(ii)(A) (information in application record and other available evidence may be dispositive of failure of relevant matter to function as a mark). Our analysis thus looks to the evidence of record bearing on consumer perception, including the manner in which Applicant uses its proposed marks. *D.C. One Wholesaler*, 120 USPQ2d at 1713 (considering, among other things, how the registrant used the alleged mark I ♥ DC on goods depicted as specimens in the application); *In re T.S. Designs Inc.*, 95 USPQ2d 1669, 1670 (TTAB 2010) (considering how applicant's specimens depicted the mark and how consumers would perceive such use); *cf. In re Gould Paper Corp.*, 834 F.2d 1017, 1019, 5 USPQ2d 1110, 1112 (Fed. Cir. 1987) (evidence of applicant's use relevant to determination of genericness); *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978) (in a descriptiveness case: "Evidence of the context in which a mark is used in labels, packages, or advertising

materials directed to the goods is probative of the reaction of prospective consumers to the mark.").

If we find that .CAM and are incapable of distinguishing source with regard to at least one service in each of International Classes 35, 38, 42 and 45, the proposed marks are unregistrable as to all refused services recited in those classes. *See In re Stereotaxis Inc.*, 429 F.3d 1039, 77 USPQ2d 1087, 1089 (Fed. Cir. 2005); *In re Analog Devices Inc.*, 6 USPQ2d 1808, 1810 (TTAB 1988), *aff'd*, 871 F.2d 1097 (unpublished table decision), 10 USPQ2d 1879 (Fed. Cir. 1989).

Applicant acknowledges that its applied-for designations, .CAM and , consist solely of a gTLD.[22] Applicant argues nonetheless that it "does not use its Mark solely as a gTLD as it is always used and will always be used by Applicant to identify Applicant as the source of its numerous, high-quality services."[23] As noted above, the Examining Attorney submitted the following definition of the term "cam" – "short for camera."[24] Applicant acknowledges that the intent of its .CAM designations is to promote entertainment, information and services related to cameras, photography and film.[25] The above excerpts from Applicant's website, spanning a time period from June 2014 through December 2017, consistently promote .CAM as a gTLD. Applicant argues:

---

[22] 6 TTABVUE 9.

[23] 6 TTABVUE 13.

[24] (January 9, 2015 Office action at .pdf 8.)

[25] July 30, 2015 Office Action at TSDR 6.

> The record contains screenshots of Applicant's primary website featuring Applicant's Mark positioned and used on the website in a classic trademark manner so as to function as a trademark. Applicant's Mark is located in the upper left corner of the header and below the text describing Applicant's Services, both positions where trademarks are traditionally located. The record also contains evidence of Applicant's Mark appearing on a significant number of other websites owned and controlled by Applicant in a manner and position typical for trademarks. These websites receive enormous amounts of traffic, often exceeding 50,000 visitors per month.[26]

We agree that evidence of record from one of Applicant's websites displays its proposed ⸱cam mark.[27] However, the screenshot shows that Applicant's website consistently discusses .CAM as a gTLD. As the Examining Attorney asserts, Applicant's webpage offers "a broad range of personal, commercial and social interests through, among other[s,] webcams, websites, social networks, email and other technologies that will be located within the domain .CAM."[28] While the page displays the proposed ⸱cam mark, its content clearly treats .CAM as a gTLD and not as a mark. Another of Applicant's webpages, excerpted above, further discusses its "new domain name extension .CAM."[29] Applicant's webpage goes on to describe .CAM as a "new generic extension (gTLD)"[30] and explains that "the new extension

---

[26] 6 TTABVUE 11 (internal citations omitted). This contrasts with Mr. Camount's affidavit in which he indicates that Applicant's websites receive 50 million visitors per month. Applicant's primary website further indicates that Applicant, AC Webconnecting, provides web services and has been operational since 1994. Thus, consumers are likely to view AC Webconnecting as a mark that identifies the source of the identified services.

[27] July 30, 2015 Office Action at TSDR 6.

[28] *Id.*

[29] December 21, 2017 Office Action at TSDR 7. Color emphasis supplied by Applicant. We reiterate that Applicant's proposed .CAM mark in application Serial No. 85635277 appears in standard characters and does not specify any color or stylization.

[30] *Id.*

.CAM is in test until September 2016. You can register domain names with the extension .CAM starting from October."[31] Thus, Applicant, on its own website, uses .CAM to refer to a gTLD and not as a trademark associated with any of its recited services. It also is clear from Applicant's website that .CAM is intended to be used by multiple parties as part of their domain names to identify multiple websites offering multiple goods and services.

Applicant has submitted additional screenshots from its website discussing its services[32] and the above affidavit of its Director General discussing the amount of traffic received by its websites featuring its proposed marks as well as its advertising expenditures and revenue associated therewith.[33] However, Applicant's website evidence and the Caumont affidavit fail to indicate that Applicant has sought to promote consumer recognition of its .CAM designations as source identifiers for its recited services. Applicant indicates that it displays the .CAM designations on various websites; however, the webpages in the record display or discuss .CAM as a gTLD. Similarly, Applicant's Caumont affidavit does not indicate what steps, if any, Applicant has taken to associate .CAM with its services such that consumers will view its .CAM designations as capable of identifying and indicating source.

Evidence discussing .CAM by third parties on their websites, as shown in the appendix, similarly demonstrates that .CAM is perceived only as a gTLD and that

---

[31] *Id.*

[32] Applicant's June 12, 2014 Response to Office Action at TSDR 5-6.

[33] 4 TTABVUE 21-23; Applicant's June 22, 2015 Request for Reconsideration at TSDR 19-21.

the gTLD is intended to be used by multiple parties as part of their domain names

to identify multiple websites offering a variety of goods and services:

> Name.com discusses .CAM as a new gTLD and suggests several .CAM domains individuals may seek to obtain;[34]
>
> Namestat indicates that .CAM is a generic TLD;[35]
>
> New gTLDs, a trademark clearinghouse offering protection for trademark holders, discusses .CAM domain details and suggests potentially available .CAM domains;[36]
>
> 101 domain.com offers information on .CAM domains and pre-reservation for .CAM domain names, and indicates that applicants do not need a trademark or brand name to register .CAM domains;[37]
>
> Papaki.com offers free pre-registration of .CAM domains;[38]
>
> Hexonet offers pre-registration of .CAM domains and suggests potential domain names incorporating .CAM;[39]
>
> Only Domains offers pre-registration of, inter alia, .CAM domains and indicates its position "that .CAM is a generic gTLD;"[40]
>
> PetaPixel discusses photography-related top-level domains, including the brand TLDs .CANON, .OLYMPUS, .NIKON, .PANASONIC, .RICOH and .SAMSUNG, and separately discussing the gTLDs .CAMERA and .CAM;[41]
>
> Famous Four Media discusses .CAM TLD domain registry and notes "the new .CAM generic Top Level Domain (TLD) allows for the making of a new

---

[34] December 12, 2013 Office Action at TSDR 9.

[35] September 4, 2015 Office Action at TSDR 26.

[36] December 12, 2013 Office Action at TSDR 11.

[37] December 12, 2013 Office Action at TSDR 13-14.

[38] December 12, 2013 Office Action at TSDR 19.

[39] September 4, 2015 Office Action at TSDR 35.

[40] January 9, 2015 Office Action at TSDR 23-24.

[41] December 12, 2013 Office Action at TSDR 23-24.

accessible channel by which the viewer or the distributor can pass in pursuing their interests in photography;"[42]

Instra Corporation offers .CAM domain registration and provides .CAM domain information including its position "that .cam is a generic gTLD, and we are pleased to accept pre-registration domain name applications for this TLD. By choosing to pre-register now, we will notify you about any upcoming developments relating to the proposed use of this TLD domain name;[43] and

Enom offers a watch list of .CAM domains so interested individuals may "get a domain that says what your site is about."[44]

Significantly, none of the third-party websites recognizes or treats .CAM as a mark. Rather, these websites treat and discuss .CAM simply as a generic TLD. A number of the third-party websites recognize Applicant, at the time, as one of three applicants to ICANN to be Registry Operator for the .CAM gTLD. As noted above, Applicant subsequently was so selected by ICANN.[45] However, none of the third-party websites treat .CAM as anything other than a gTLD, which Applicant could manage as its potential future registry operator. This website evidence, therefore, supports a finding that .CAM is not perceived as functioning to indicate source.

With regard to the third-party CAM-formative registrations submitted by Applicant, we observe that none of the registrations appears to consist of gTLDs or terms that may be construed as TLDs. As such, this evidence has little probative value on the question of whether Applicant's .CAM designations are capable of functioning as marks. In addition, "[i]t has been said many times that each case must

---

[42] January 9, 2015 Office Action at TSDR 26.

[43] January 9, 2015 Office Action at TSDR 29.

[44] July 30, 2015 Office Action at TSDR 12.

[45] Applicant's October 16, 2017 Response to Office Action at TSDR 9-100.

be decided on its own facts." *In re Eagle Crest Inc.,* 96 USPQ2d 1227, 1229 (TTAB 2010) (internal citation omitted).

We turn to Applicant's services recited in International Class 45, namely:

> Legal services related to domain names with the TLD that appears in the mark; Domain name registration services, namely, conducting domain name searches related to domain names with the TLD that appears in the mark for the purpose of providing legal advice on domain name registration; consultancy and information regarding the aforesaid services that are related to domain names with the TLD that appears in the mark, including via electronic networks, such as the Internet.

Applicant's Class 45 services include domain name registration and legal, consulting and information services related to domain name registration, all with regard to the .CAM gTLD. The evidence of record clearly indicates that consumers perceive .CAM as a generic string TLD, particularly in relation to services connected with domain name registration. The evidence of record also clearly establishes that third parties register and pre-register domain names with the .CAM gTLD, among others. As discussed above, Applicant's Registry Agreement with ICANN contains Specification 11, applicable to a "Generic String" TLD.[46] Thus, ICANN also recognizes .CAM as a generic TLD and not a .Brand TLD, such as .NIKON or .CANON. There is no evidence that .CAM is perceived as anything other than a gTLD, and very little evidence that Applicant has used or promoted .CAM as a unique source identifier. On the webpage where Applicant displays , in a manner that visually suggests a trademark, the content of that page (and other pages) undercuts any inference of trademark use by discussing .CAM as a gTLD. Furthermore, the .CAM gTLD will be used by multiple

---

[46] Applicant's October 16, 2017 Response to Office Action at TSDR 96-7.

parties as part of their domain names, underscoring its function as a top level domain locator on the Internet, undermining any consumer perception of .CAM as a trademark identifying the source of a domain name registration service or related services. Accordingly, we find, based on the evidence of record in this case, that .CAM is incapable of identifying and distinguishing, at least, Applicant's domain name registration and related services in Class 45. *Cf. In re theDot*, 101 USPQ2d at 1068 (.MUSIC held merely descriptive of "registration of domain names for identification of users on a global computer network").

We next turn to Applicant's services recited in International Class 35 that are subject to the refusal of registration:

> Business consultation; Database management; Business administration consultancy; Assistance, advisory services and consultancy with regard to business planning, business analysis, business management, and business organization; Business advice and commercial information; Business management services, namely, managing office functions in the nature of compiling and managing of databases and secretarial services relating to the creation and registration of domain names for others; Commercial consultancy; Business management consultancy; consultancy and information regarding the aforesaid services; the aforesaid services also provided via electronic networks, such as the Internet.

Applicant's Class 35 services include business management services that specifically involve compiling and managing databases and providing secretarial services relating to the creation and registration of domain names. These services, identified without limitation, must be presumed to include compiling and managing databases and secretarial services related to the creation and registration of domain names with the .CAM gTLD. *See, e.g., Southwestern Mgmt., Inc. v. Ocinomled, Ltd.,*

115 USPQ2d 1007, 1025 (TTAB 2015) (with a broad identification of services, "we must presume that the services encompass all services of the type identified"); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (same); *see also In re Allen Elec. & Equip. Co.*, 458 F.2d 1404, 173 USPQ 689 (CCPA 1972) ("Since the goods are described merely as 'antennas' and that term is broad enough to encompass 'scanning antennas,' the mark SCANNER as applied to the goods is merely descriptive ….").

This presumption is buttressed by ICANN's selection of Applicant as Registry Operator for the .CAM gTLD. The evidence of record clearly indicates that consumers perceive .CAM only as a gTLD in relation to services connected with domain name registration and creation. The evidence of record also clearly establishes that third parties offer to help consumers select, create, register and pre-register domain names with the .CAM gTLD. There is no evidence that .CAM is perceived as anything other than a gTLD in connection with services related to domain name creation and registration. Further, Applicant's own webpages discuss .CAM as a gTLD. Accordingly, we find that .CAM is incapable of identifying and distinguishing, at least, Applicant's business management services in the field of creation and registration of domain names in Class 35.

We next consider Applicant's services recited in International Class 38 that are subject to the refusal of registration:

> Telecommunication services, namely, transmission of voice, data, graphics, images, audio and video by means of telecommunications networks, wireless communication networks, and the Internet; Telecommunication services, namely, providing Internet access via broadband optical or wireless networks; Providing access to telecommunication networks; Electronic mail and messaging services;

> Electronic transmission of information posted to usenet newsgroups and discussion groups via a global computer network; Rental of telecommunication facilities; Rental of telecommunications apparatus and installations; Rental of telecommunication equipment, namely, network apparatus, network instruments, network interfaces, installations, telephones; Providing access to databases; Providing telecommunications connections to the Internet or databases; Providing access to the Internet; Providing multiple-user access to data on the Internet in the field of search engine optimization for searching, retrieving, indexing, linking and arranging data for the Internet, electronic communications networks and electronic databases; consultancy and information regarding the aforesaid services, including provided via electronic networks, such as the Internet.

Applicant's Class 38 services include providing access to databases, the Internet and transmission of multimedia communications via the Internet. These broadly identified services must also be presumed to include, inter alia, providing access to databases of domain names with the .CAM gTLD, and transmission of voice, images, audio and video to and from websites featuring the .CAM gTLD. *Southwestern Mgmt. v. Ocinomled*, 115 USPQ2d 1025. Applicant's website further indicates that it provides web space for entertainment by means of webcams, websites, social media and other technologies in connection with the .CAM gTLD. The evidence of record clearly indicates that consumers perceive .CAM as a gTLD in relation to domain services connected with cameras and Internet technology. Again, there is no evidence that .CAM is perceived as anything other than a gTLD in connection with services related to domains and websites having to do with webcams, cameras and photography. Accordingly, we find that .CAM is incapable of identifying and distinguishing, at least, Applicant's database and Internet access, and multimedia communication connected with the .CAM gTLD in Class 38.

Finally, we consider Applicant's services recited in International Class 42 that are subject to the refusal of registration:

> Design, development and implementation of software; Preparation, update, installation and maintenance of computer software; Database design and development; Design and development of computer hardware; Design and development of computers and programs for computers; Data automation and collection service using proprietary software to evaluate, analyze and collect service data; Computer programming consultancy; Computer software consultancy; Planning, design and management of information technology systems; Information technology consultation; Computer technology support services, namely, help desk services; Computer programming and computer system analysis; Business technology software consultation services; Technology consultation in the field of communications and computer hardware and software; Computer programming; Planning, design, development, maintenance and optimization of online websites for third parties; Design, maintenance, development and updating of computer software; Web site hosting services; Quality management services, namely, quality evaluation and analysis, quality assurance, and quality control, in the field of computers and computer peripheral devices; Graphic design services; Computer services, namely, providing search engines for obtaining data on a global computer network; Computer security consultancy; Design and development of electronic data security systems; Maintenance of computer software relating to computer security and prevention of computer risks; Research and development of technology in the field of computer hardware and software; Provision of search engines for the Internet; computer services, namely, search engine optimization in the nature of the positioning, optimization, notification, monitoring and adjustment of the findability of the websites of others using search engines; Development, maintenance and updating of a telecommunication network search engine; rental of computer hardware; consultancy and information regarding the aforesaid services, including provided via electronic networks, such as the Internet in International Class 42.

Applicant's Class 42 services include planning, design, development, maintenance and optimization of websites for third parties, web site hosting services and search engine optimization to facilitate location of websites using search engines as well as help desk services related thereto. These services include, inter alia, services directed

toward websites with the .CAM gTLD, including planning, design, development, hosting, maintenance and optimization of websites featuring the .CAM gTLD. The evidence of record clearly indicates that consumers perceive .CAM as a gTLD in relation to domain services connected with cameras and Internet technology. The evidence of record further suggests that one of the reasons to obtain a .CAM gTLD domain extension is to assist individuals and businesses with websites concerning webcams, cameras and photography. Applicant's Class 42 services enable and assist users to design, host, maintain and optimize websites accessible through the .CAM gTLD. Accordingly, we find that .CAM is incapable of identifying and distinguishing, at least, Applicant's database and Internet access, and multimedia communication connected with the .CAM gTLD in Class 42.

### D. Stylization of Designation

The evidence of record establishes that consumers would not perceive .CAM as capable of identifying and distinguishing source for the recited services subject to the refusal of registration, and instead would perceive it merely as a gTLD in connection therewith. With regard to Applicant's proposed mark , it is well established that "for a term otherwise unregistrable to be capable of distinguishing an applicant's goods, the presentation of the term must be sufficiently striking, unique or distinctive so as to overcome its inherent incapacity and render the mark capable of serving as a source indicator." *In re Cosmetic Factory, Inc.*, 220 USPQ 1103 (TTAB 1983). The decision of capability is dependent on the nature of the presentation of the unregistrable matter in each case.

Our primary reviewing court, its predecessor court and this tribunal have found a sufficiently unique display of otherwise unregistrable matter warrants registration on the Supplemental Register. *See In re K-T Zoe Furniture, Inc.*, 29 USPQ2d 1787, 1789 (Fed. Cir. 1994) (court found the words and stylized script of the mark THE SOFA AND CHAIR COMPANY were separable elements, and that only the script design of the words had acquired secondary meaning); *In re Wella Corporation*, 635 F.2d 845, 196 USPQ 7, 8 (CCPA 1977) (court found registrable the term BALSAM displayed in a "unique style" of lettering); *In re Carolyn's Candie's Inc.*, 206 USPQ 356, 361 (TTAB 1980) (Board found "style of display" of the words YOGURT BAR more distictive than that of BALSAM in *Wella* case).

On the other hand, the Board also has found the "completely ordinary and nondistinctive" stylized display of matter unregistrable on the Supplemental Register because it is incapable of functioning as a trademark for the applicant's goods or services. *In re Anchor Hocking Corp.*, 223 USPQ 85, 88 (TTAB 1984) (Board found MICROWAVE TURNTABLE to be the generic name of applicant's goods and "displayed in plain block style of lettering which obviously is not unique"); *see also In re Cosmetic Factory,* 220 USPQ at 1103 (Board found style of lettering of BODY SOAP to be ordinary and nondistinctive); *In re Sambado & Son Inc.*, 45 USPQ2d 1312, 1316 (TTAB 1997) (FRUTTA FRESCA, equivalent to "fresh fruit," found to be generic term for the goods and the presentation of the term found "not so unique or unusual as to create a distinctive commercial impression apart from the words.") (overruled in part on other grounds by *In re Driven Innovations, Inc.*, 115 USPQ2d 1262, 1265 (TTAB

2015)). *See also In re Cordua Restaurants, Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1639-1640 (Fed. Cir. 2016) (stylization of "churrascos" does not create separate impression from that made by generic term).

It is our view that in this case, the presentation of Applicant's proposed mark does not possess the degree of stylization that would warrant allowance on the Supplemental Register. The term ".CAM" is displayed in a very slightly stylized script that is not unique or unusual and the "dot" is displayed in the color green with no additional stylization or design. The display of Applicant's proposed mark conveys the commercial impression of a gTLD. The stylization of the term ".CAM" in Applicant's proposed mark does not present any unique characteristics, such as the monogram design in *Jackson Hole*, the uniquely stylized lettering in *Wella*, or the unusual lettering style and placement of the words in *Carolyn's Candie's*. It does not create a commercial impression separate from the unregistrable term ".CAM".

Further, the green color of the "." in serves to emphasize the gTLD nature of the designation and will not be perceived as creating a separate commercial impression apart from the literal component. We thus find the applied-for mark in its entirety to be incapable of distinguishing Applicant's goods from those of others.

As noted earlier, on the webpage where Applicant displays in a manner that visually suggests a trademark, the content of that page (and other pages) undercuts

any inference of trademark use by discussing .CAM as a gTLD.[47] Applicant displays its ⬤ᴄᴀᴍ designation at the top left-hand corner of a webpage above the subheadings Dutch Masters, Scoopers and Weroulette. It is unclear whether the latter terms are intended as trademarks or indicative of the subject matter of the webpages sampled therewith, and the included screenshots of the webpages, aside from photographs, are largely illegible. Significantly, the printed information following the subheadings and screenshots discusses and references .CAM solely as a TLD. The following example is illustrative: "The TLD will provide a broad range of personal, commercial and social interests through, among other [things,] webcams, websites, social networks, e-mail and other technologies that will be located within the domain .CAM."[48] Despite Applicant's placement of the ⬤ᴄᴀᴍ designation in a manner intended to convey trademark use, consumers viewing ⬤ᴄᴀᴍ in context will perceive the term as denoting a TLD when viewed in context of Applicant's use of the term.

We find that the minimal stylization and color of ⬤ᴄᴀᴍ as used by Applicant on its websites are insufficient to create a commercial impression that is separate from the term .CAM.

### E. Conclusion

Applicant's proposed marks .CAM and ⬤ᴄᴀᴍ , applied-for on the Supplemental Register, are incapable under Section 23 of the Trademark Act of 1946, 15 U.S.C.

---

[47] *See, e.g.*, July 30, 2015 Office Action at .pdf 5-6.

[48] July 30, 2015 Office Action at .pdf 6.

§1091, of functioning as service marks to identify and distinguish Applicant's services from those of others and to indicate the source of Applicant's services as to the affected services in Classes 35, 38, 42 and 45.

**Decision**: The refusal to register Applicant's proposed mark, .CAM (subject of Application 85635277) based on its failure to function as a mark, is affirmed.

The refusal to register Applicant's mark (subject of Application 85635287) based on its failure to function as a mark, is also affirmed.

As noted above, the Examining Attorney withdrew the refusal of registration as to the services recited infra in International Classes 35, 38 and 42. [49] In consequence thereof, the registrability of the .CAM designations for services not subject to the refusal of registration is not before us. The involved applications will proceed to registration for those services against which the refusal to register was withdrawn, namely:

> Accounting consultation; Business advice and information relating to loans, finance and capital; Business assistance, advisory and consulting services in the field of filing business formation documents; Economic feasibility studies; Payroll administration and management services; Payroll preparation; development of processes for the analysis and the implementation of strategy plans and management projects, in Class 35;

> Rental of telecommunication equipment, namely, facsimile machines, in Class 38; and

> Consulting services in the field of office and workplace automation, in Class 42.

---

[49] 27 TTABVUE.

### 1. Appendix of Third-Party Webpage Evidence

Screenshots from third-party webpages:



(June 4, 2012 Office Action at TSDR 95-7);



(December 12, 2013 Office Action at .pdf 9);

(September 4, 2015 Office Action at TSDR 26);



(December 12, 2013 Office Action at TSDR 11);





(September 4, 2015 Office Action at TSDR 15);





(December 12, 2013 Office Action at TSDR 13-4);



(December 12, 2013 Office Action at TSDR 19);



(September 4, 2015 Office Action at TSDR 35);

(July 30, 2015 Office Action at TSDR 12);



(January 9, 2015 Office Action at TSDR 23-4)





(January 9, 2015 Office Action at TSDR 26);



(January 9, 2015 Office Action at TSDR 29);



(January 9, 2015 Office Action at TSDR 31); and



(January 9, 2015 Office Action at TSDR 34)